No. 13-1619

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

JAMES N. HUTCHERSON, ET AL.

Plaintiffs-Appellants,

v.

CHAE Y. LIM,

Defendant-Appellee.

On Appeal from the United States District Court
for the District of Maryland -- Southern Division
(Judge Titus)

SUPPLEMENTAL APPENDIX

Gerard J. Stief (L)
Chief Counsel – Appeals & Special Lit.

Kathryn Pett
General Counsel

WASHINGTON METROPOLITAN AREA
  TRANSIT AUTHORITY
600 Fifth Street, NW
Washington, D.C.  20001
202-962-1463 (phone)
202-962-2550 (fax)
Attorneys for Defendant-Appellee Lim

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Unpublished 4th Circuit Opinion dated August 30, 2011in this case ....337

<u>De Bene Esse</u> Testimony of Dr. Donald E. Thomas, Jr........................344

     Direct.............................................................................348
     Cross.............................................................................365
     Redirect .........................................................................368

**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

No. 10-1937

———————

JAMES N. HUTCHERSON, JR.; SHARON T. HUTCHERSON

Plaintiffs - Appellants,

v.

CHAE Y. LIM, individually and in his professional/employment capacity,

Defendant - Appellee,

and

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,

Defendant.

———————

Appeal from the United Sates District Court for the District of Maryland, at Greenbelt.  Roger W. Titus, District Judge.  (8:08-cv-03044-RWT)

———————

Submitted:  June 28, 2011              Decided:  August 30, 2011

———————

Before KING, GREGORY, and DUNCAN, Circuit Judges.

———————

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.

———————

Anitha W. Johnson, ODELUGO & JOHNSON, Hyattsville, Maryland, for Appellants.  Gerard J. Stief, Senior Associate General Counsel,

Carol B. O'Keeffe, General Counsel, WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY, Washington, D.C., for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

2

338

PER CURIAM:

James N. Hutcherson, Jr., and Sharon T. Hutcherson appeal the district court's orders granting summary judgment in favor of Officer Chae Lim on their state law tort claims and denying reconsideration. On appeal, the Hutchersons argue that the district court should have declined to exercise supplemental jurisdiction over their state law claims and that the court erred in granting summary judgment in favor of Officer Lim on their false imprisonment, assault, and loss of consortium claims.[*]  We affirm the district court's judgment in part, vacate in part, and remand for further proceedings.

The Hutchersons first contend that the district court erred in exercising supplemental jurisdiction over their state law tort claims. Once the district court dismissed the Washington Metropolitan Area Transit Authority ("WMATA") and the claims over which it had original jurisdiction, the court had "wide latitude in determining whether or not to retain jurisdiction over [the] state claims." Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995); see 28 U.S.C. § 1367(a), (c)(3)

---

[*] The Hutchersons do not challenge on appeal the district court's grant of summary judgment for Officer Lim on the negligence and intentional infliction of emotional distress claims. See Edwards v. City of Goldsboro, 178 F.3d 231, 241 n.6 (4th Cir. 1999) (concluding that issue not raised in opening brief is deemed abandoned).

3

339

(2006).  In exercising its discretion, the district court should consider "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy."  Shanaghan, 58 F.3d at 110 (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).  Additionally, "[a] district court can consider whether the plaintiff has engaged in any manipulative tactics when it decides whether to remand a case.  If the plaintiff has attempted to manipulate the forum, the court should take this behavior into account. . . ."  Cohill, 484 U.S. at 357.  Upon review, we conclude that the district court did not abuse its discretion in retaining supplemental jurisdiction over the Hutchersons' state law claims.

The Hutchersons also contend that the district court erred in granting summary judgment for Officer Lim on the false imprisonment, assault, and loss of consortium claims.  We review a district court's grant of summary judgment de novo, "viewing the facts and the reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."  Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the moving

4

340

party sufficiently supports its motion for summary judgment, the nonmoving party must demonstrate "that there are genuine issues of material fact." Emmett, 532 F.3d at 297.

In Maryland, "[t]he elements of . . . false imprisonment . . . are: 1) the deprivation of the liberty of another; 2) without consent; and 3) without legal justification." Heron v. Strader, 761 A.2d 56, 59 (Md. 2000). Maryland courts read "legal justification . . . as equivalent to legal authority." Great Atl. & Pac. Tea Co. v. Paul, 261 A.2d 731, 738 (Md. 1970). "Whatever technical distinction there may be between an 'arrest' and a 'detention' the test whether legal justification existed in a particular case has been judged by the principles applicable to the law of arrest." Id. Our review of the record leads us to conclude that the district court properly granted summary judgment in Officer Lim's favor and denied reconsideration on this issue.

Turning to the assault claim, the Maryland Tort Claims Act ("MTCA"), on which the district court based its grant of immunity, is inapplicable to this case. The MCTA provides immunity from tort liability for "[s]tate personnel" who act "within the scope of [their] public duties . . . without malice or gross negligence." Md. Code Ann., Cts. & Jud. Proc. § 5-522(b) (LexisNexis 2009); see Md. Code Ann., State Gov't § 12-105 (LexisNexis 2009). WMATA police officers are not, however,

considered "[s]tate personnel," Md. Code Ann., State Gov't § 12-101 (LexisNexis 2009), and are therefore not eligible for immunity under the MTCA. See Houghton v. Forrest, 989 A.2d 223, 230 (Md. 2010) (finding that city police officer was not included in the MTCA's list of "state personnel" and so could not claim immunity under the MTCA). Thus, the district court improperly based its grant of summary judgment for Officer Lim on the assault claim on MTCA immunity.

Moreover, we conclude that there is a genuine dispute of material fact as to whether Officer Lim's actions were legally justified. See Cooper v. State, 737 A.2d 613, 617 (Md. 1999) (stating that required elements of an assault claim are "that the (1) defendant caused a harmful physical contact with the victim, (2) the contact was intentional, and (3) the contact was not legally justified"). We therefore vacate the district court's grant of summary judgment and denial of reconsideration on the Hutchersons' assault claim. Further, because a loss of consortium claim is premised on the viability of other claims, Oaks v. Connors, 660 A.2d 423, 430 (Md. 1995), we also vacate the district court's grant of summary judgment and denial of reconsideration on that issue.

Accordingly, we affirm the district court's grant of summary judgment and denial of reconsideration in part, vacate in part, and remand for further proceedings consistent with this

6

342

opinion. We dispense with oral argument because the facts and legal conclusions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED IN PART,
VACATED IN PART, AND REMANDED

343

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


JAMES N. HUTCHERSON, JR.,

et al.

        Plaintiffs

vs.                                    Civil Action No.

WASHINGTON METROPOLITAN                8:2008cv03044

AREA TRANSIT AUTHORITY,

et al.

        Defendants

_____/



        The videotaped deposition of DONALD E.

THOMAS, JR., M.D. was held on Thursday, August 2, 2012,

commencing at 4:45 p.m., at the Offices of Arthritis

and Pain Associates of P.G. County, 9131 Piscataway

Road, Suite 310, Clinton, Maryland 20735, before Heather

Avalos, a Notary Public.


REPORTED BY:  Heather Avalos

2

1  APPEARANCES:

2              ON BEHALF OF THE PLAINTIFFS:

3              ANITHA JOHNSON, ESQUIRE

4                  Odelugo & Johnson

5                  6525 Belcrest Road, Suite 612

6                  Hyattsville, Maryland 20782

7                  Telephone: 301-832-3020

8                  Facsimile: 301-832-3029

9                  Email: anitha.johnson@odelugo.com

10

11             ON BEHALF OF THE DEFENDANTS:

12             GERARD J. STIEF, ESQUIRE

13                 Washington Metropolitan Area

14                 Transit Authority

15                 600 Fifth Street, N.W.

16                 Washington, D.C. 20001

17                 Telephone: 202-962-1013

18                 Facsimile: 202-962-2550

19                 Email: gstief@wmata.com

20

21  ALSO PRESENT:  David Voightsberger, Videographer

3

1                          INDEX

2          Deposition of DONALD E. THOMAS, JR., M.D.

3                     August 2, 2012

4

5     Examination By:                              Page

6     Mrs. Johnson                                5, 25

7     Mr. Stief                                      22

8

9

10

11

12

13

14

15

16

17

18

19

20

21

4

```
                        PROCEEDINGS
1
2               THE VIDEOGRAPHER:   Good afternoon.   My name
3   is David Voightsberger with Gore Brothers Reporting, 20
4   South Charles Street, Baltimore, Maryland.
5               I will be the video operator taking the
6   video deposition of Donald E. Thomas, Jr., M.D. in the
7   matter of James N. Hutcherson, et al., versus Officer
8   Lim now pending in the United States District Court for
9   the District of Maryland, case number
10  8:08-CV-03044-RWT.
11              The deposition has been noticed by Anitha
12  Johnson, counsel for the plaintiff, and is commencing
13  on August 2nd, 2012.   Our location is 9131 Piscataway
14  Road, Clinton, Maryland.   Our court reporter is Heather
15  Avalos with Gore Brothers Reporting.
16              Counsel, please introduce yourselves and
17  who you represent.
18              MRS. JOHNSON:   Anitha Johnson.   I represent
19  Mr. James Hutcherson and Mrs. Hutcherson, his wife.
20              MR. STIEF:   I'm Gerard Stief, S-T-I-E-F,
21  representing the defendant Officer Limb.
```

5

1          THE VIDEOGRAPHER:   Will the court reporter

2     please swear in the witness.

3     Whereupon,

4               DONALD E. THOMAS, JR., M.D.,

5     called for examination, having been first duly sworn to

6     tell the truth, the whole truth and nothing but the

7     truth, was examined and testified as follows:

8                    EXAMINATION BY MRS. JOHNSON:

9          Q     Doctor, please state your name and business

10    address for the record.

11         A     Donald Eugene Thomas, Jr.  Last name

12    spelled T-H-O-M-A-S.  My office is -- primary office is

13    Arthritis and Pain Associates of Prince George's

14    County.  The main office is 7300 Hanover Drive --

15    spelled H-A-N-O-V-E-R -- Greenbelt, Maryland.

16         Q     And how many offices do you have?

17         A     Two.

18         Q     And I know you've given me your CV.  But

19    could you describe your educational background.

20         A     Yes.  I went to Baylor College of Medicine,

21    which is in Houston, Texas.  Graduated in 1989 with my

6

1  medical degree.  I was in the military.  So I did my

2  residency in internal medicine at Burke Army Medical

3  Center, which is in San Antonio, Texas.  I was a

4  general internist for one year at Port Sill, Oklahoma.

5          Then I did my rheumatology fellowship

6  program at Walter Reed Army Medical Center where I

7  graduated in 1995.

8          I stayed on the teaching staff at Walter

9  Reed for three years at which point I went out into

10 private practice in 1998 in the practice that I'm

11 currently in.

12     Q     And how many doctors are in your practice?

13     A     We have three physicians and one physician

14 assistant in addition to me.

15     Q     And what is your area of medical specialty?

16     A     Rheumatology.

17     Q     And could you describe what a

18 rheumatologist does?

19     A     Yes.  Rheumatologists can be thought of as

20 the medical counterpart to orthopedic surgeons.  We all

21 diagnose and treat and manage musculoskeletal diseases,

7

1    so anything that has to do with the muscles, joints,

2    and bones of the body.  We as rheumatologists treat

3    them nonsurgically and orthopedic surgeons treat them

4    surgically.

5            In addition, we also treat and manage a

6    group of diseases called systemic autoimmune diseases,

7    which does include rheumatoid arthritis, because almost

8    all of those diseases can cause arthritis.

9        Q    And what is the average number of patients

10   you see per day?

11       A    Per day, I see around sixteen to eighteen.

12   That's changing.

13       Q    And you work five days a week?

14       A    Yes, I do.

15       Q    And are you board certified in any medical

16   specialty?

17       A    Yes.  I'm board certified in both internal

18   medicine and rheumatology.

19       Q    And how long have you been board certified

20   in rheumatology?

21       A    Rheumatology would be since I finished my

8

1    fellowship.  I don't know exactly the day, but it's

2    either 1995 or 1996.

3         Q    And how does a doctor become board

4    certified?

5         A    You sit down for one or two days of

6    testing.  It's a set of tests that are devised by the

7    American Board of Internal Medicine.  And then you

8    either pass or you fail.

9         Q    And you -- from your CV, its says you were

10   assistant professor of medicine.

11            Is that what you described earlier?

12        A    At the Uniformed Services University of the

13   Health Sciences, which is the medical school for the

14   military based in Bethesda, Maryland, I'm an assistant

15   professor of clinical medicine.

16        Q    And how long have you been an assistant

17   professor?

18        A    Since 1995.

19        Q    And have you received any honors or awards

20   in your career?

21        A    Yes.

9

1      Q       Could you list them, please.

2      A       I am a fellow of the American College of

3  Physicians, which means that other physicians who have

4  the designation of FACP at the end of their name have

5  sponsored me to be considered for that designation.

6  And usually that's given to people who have excelled in

7  things such as research and education and other

8  commitments to internal medicine.

9              I've also been chosen by my peers in -- a

10  couple of times in Washingtonian magazine to be

11  considered one of the top physicians for rheumatology

12  in the Washington, D.C. area as well.

13      Q       And I also see from your CV it says

14  American Registry.

15              What is that?

16      A       Oh, top physicians in the country -- since

17  2004, most years I've been included as a top physician

18  in the United States.

19      Q       And are you involved in any professional

20  organizations?

21      A       Yes.  I am a member of the Medical Advisory

10

1   Committee for the Lupus Foundation of America, the

2   D.C., Maryland, Virginia chapter.  I've been doing that

3   since the late 1990s.

4          Q      And what is the American College of

5   Physicians?

6          A      American College of Physicians is our

7   professional organization for internal medicine which

8   is nationwide in the United States.

9          Q      And how long have you been a member of that

10  organization?

11         A      Since the early 1990s, probably when I

12  graduated from residency, which would have been 1992.

13         Q      And from your CV, you note different

14  teaching activities.

15                How many teaching activities have you been

16  involved in?

17         A      Numerous.  I go to the medical school and

18  also to Walter Reed Army Medical Center for the

19  fellowship program.  And I usually do some sort of

20  teaching about four times per year at least.  And I

21  also do extensive teaching in the community where I

1    volunteer lectures to patients and other organizations.

2         Q      Have you published any material?

3         A      I have but never as a primary author.  As a

4    secondary and tertiary authors I have.

5         Q      Do you consider yourself an expert in the

6    field of rheumatology?

7         A      Yes, I do.

8         Q      Do you consider yourself an expert in any

9    other field?

10        A      Lupus.  That's one of my major interests.

11        Q      And now bringing your attention to James

12   Hutcherson.  Did there come a time when James

13   Hutcherson was your patient?

14        A      Yes, ma'am.

15        Q      When is the first time Mr. Hutcherson was

16   seen by you?

17        A      You don't mind if I look at my notes?

18        Q      Sure.

19        A      These were typed notes but I also have his

20   chart if you need me to look up anything.

21               I first saw Mr. Hutcherson the 18th of May,

12

1    2007.

2         Q     And what was his chief complaint?

3         A     Multiple joint aches and pains and help

4    with pain management.

5         Q     And did you start treating him?

6         A     Yes, I did.

7         Q     And what type of treatment did you render

8    to Mr. Hutcherson?

9         A     Well, the first time I saw him, I still

10   didn't know exactly what was going on.  I had

11   suspicions of what was going on.  I would have to look

12   at my initial note to know exactly what I did that

13   first day.

14             But by the second visit, I knew that he did

15   have rheumatoid arthritis, osteoarthritis, and also

16   polyneuropathy.  And I started him on prednisone and

17   methotrexate, which is an immunosuppressant medication.

18        Q     And could you describe those three

19   diagnoses?

20        A     Sure.  Osteoarthritis is due to the aging

21   process.  And also trauma can also cause it as well.

13

1    Basically, all of us will develop osteoarthritis by the

2    time we become fifty years of age.  So he did have

3    that.

4              In addition, he had rheumatoid arthritis.

5    And that's a systemic autoimmune disease, which means

6    that his own immune system was overactive and attacking

7    the joints of his body causing swelling, stiffness, and

8    pain.

9              And then he also had some damage to the

10   nerves in his legs as well.

11        Q    And after your initial treatment with

12   Mr. Hutcherson, did you treat him after the incident

13   that occurred on September 27th, 2007?

14        A    Yes.  Numerous times.

15        Q    And when was the first time you treated him

16   after September 27th, 2007?

17        A    Let me look at my records here.

18             To the best of my knowledge, the first time

19   that I saw him after the said incident was October 5th,

20   2007.

21        Q    And at that time, that October, 2007, what

14

1    was that visit for?

2        A    That particular visit was to give him an

3    injection in his right knee, a medicine called

4    Nuflexxa.

5        Q    Was that a follow-up from a previous visit

6    that he had with you?

7        A    Yes, it was.

8        Q    Would you know whether he had that

9    appointment set prior to September 27, 2007?

10       A    Yes.  Because I saw him August the 27th,

11   2007.  And as part of that note, I put down that I

12   would begin Nuflexxa injections in one month.

13       Q    And at the time when he came to you on

14   October of 2007, did he mention or make note of the

15   incident that occurred on September 27, 2007?

16       A    I do not recall.  But in my note, I did not

17   mention it.

18       Q    And after October, did you continue to see

19   Mr. Hutcherson?

20       A    Yes, I did.

21       Q    And did Mr. Hutcherson ever complain about

15

1   his -- any shoulder pain?

2       A       Yes, he did.

3       Q       Which shoulder was he --

4       A       The left shoulder.

5       Q       And how did you treat his left shoulder?

6       A       Well, with Mr. Hutcherson, he had multiple

7   joints that were very painful.  It just wasn't the left

8   shoulder I was targeting my therapy at.  He complained

9   of multiple joints that hurt from his two different

10  types of arthritises.  So I did not target treatment

11  just at the shoulder because that was not his primary

12  complaint to me or at least I did not assume that.

13      Q       Did there come a time that you treated him

14  for a partial tear of his rotator cuff?

15              MR. STIEF:  Objection.  Leading.

16              Go ahead.

17              THE WITNESS:  I don't know how to answer

18  that.

19      Q       I can rephrase it.

20              Did you treat Mr. Hutcherson for anything

21  else other than the multiple pain that he received --

16

1  that he complained of?

2      A    He also has cervical radiculopathy which

3  means the disks in the neck were squeezing against the

4  nerves that go into the arms.  The polyneuropathy, as I

5  already mentioned.  And can I say partial rotator cuff

6  tear?

7      Q    Sure.

8      A    Okay.  Partial rotator cuff tear.

9      Q    When did you start treating him for a

10  partial rotator cuff tear?

11      A    It was on -- according to my written notes

12  that I wrote down, when I saw him in July, 2008, he

13  specifically complained of markedly increased pain in

14  the left shoulder on that date.  So I gave him a

15  corticosteroid injection for the shoulder and ordered

16  an MRI at that point.  The MRI subsequently did show a

17  partial rotator cuff tear in the left shoulder.

18      Q    And on July, 2008, was that the first time

19  he complained of pain to his left shoulder?

20      A    No.  He complained of pain in his left

21  shoulder every visit since I've ever seen him except

17

1  for one time.

2          Q      And what was the level of pain?

3          A      You want me to go back and --

4          Q      Actually, I'll withdraw that.

5          A      Just looking, for example, on one -- we ask

6   patients to rate their pain on a scale of one to ten.

7   And the one I opened up says nine over ten, which is

8   considered severe.

9          Q      And what date was that that you just --

10         A      May 30th, 2008.

11         Q      In your practice, do you regularly treat

12  rotator cuff tears?

13         A      Yes, all the time.

14         Q      And how does one treat a rotator cuff tear?

15         A      It depends upon what causes it and how

16  acute it is and the age of the patient.  It's multiple

17  factors that you have to consider in treatment.

18         Q      Is there any surgery for --

19         A      Yes.

20         Q      Was surgery considered for Mr. Hutcherson?

21         A      No.  In his particular instance, it would

18

1  be a treatment of last resort because his -- he was an

2  older individual and that is related to his arthritises

3  such as his osteoarthritis and his rheumatoid

4  arthritis.

5        Q      Has Mr. Hutcherson's tear healed?

6        A      No.  Rotator cuff tears don't really heal.

7  Let me rephrase that.  When someone says the word heal

8  to me, that means that it's cured in some way.  And

9  that just never happens.

10        Q      Even with surgery?

11        A      Even with surgery.  Well, they can try to

12  decrease the problems with surgery.  But they can never

13  make it cured or go away.

14        Q      And just in your experience, can a person

15  with a partial -- I'm sorry.  What type of tear did

16  Mr. --

17        A      He has a partial rotator cuff tear.  What

18  that means is there is a group of tendons that are --

19  four different tendons that connect the upper arm to

20  the shoulder.  They're called rotator cuff tendons.  If

21  there is a tear completely through one of those, we

19

1    call it a full rotator cuff tear.  If one of the

2    tendons just has a slight tear but not completely

3    through, we call it a partial rotator cuff tear.

4        Q     And in your experience, when are partial

5    tears commonly seen?

6        A     They can be due to many different reasons.

7    But the -- by far the two most common would be either

8    degenerative, which most commonly -- or oftentimes I

9    should say is related to osteoarthritis of the

10   shoulder, especially the acromial clavicular joint,

11   which is the joint right here.  And oftentimes there is

12   a bone spur on the bottom.  And then the rotator

13   cuff -- this coming underneath it.  And then that bone

14   spur will scrape against it over time causing a tear to

15   develop.  And that usually happens in older people.

16          The other cause of a rotator cuff tear

17   would be injury.

18       Q     And what type of injury could cause a

19   rotator cuff tear?

20       A     Any type of forceful injury, most commonly

21   it would be an overhead injury, in this direction, or

20

1    going back with the arm in this direction.  The other

2    one, especially in elderly patients, is if they fall

3    and they try to catch themselves with their arm.  That

4    can also do it.

5         Q    Just trying to catch themselves with their

6    arm, that's enough force to tear their rotator cuff?

7         A    They certainly can.  Yes.

8         Q    And is it possible for the partial tear to

9    get better and then to get worse?

10        A    Symptomatically, yes.  I mean the tear is

11   always going to be there.

12        Q    Can you explain how that could happen?

13        A    When someone tears their rotator cuff, they

14   can end up having discomfort or pain potentially

15   because of the tear.  And then it can get better on its

16   own or wax and wane over time.  But the tear is always

17   there.

18        Q    Is there any information that you would

19   have to determine whether Mr. Hutcherson's rotator cuff

20   tear came from trauma or from degenerative disease?

21             MR. STIEF:  Objection.  Speculation.

1    Outside of the scope of any report.

2         Q      You can answer.

3         A      I can answer?

4              MR. STIEF:  Yes.

5              THE WITNESS:  Can you rephrase the

6    question, please.

7         Q      Did you make a determination of whether

8    Mr. Hutcherson's partial tear came from trauma or from

9    degenerative disease?

10             MR. STIEF:  Same objection.

11             THE WITNESS:  I can answer it still?  I can

12   give my medical opinion.

13        Q      Yes.

14        A      There are several possibilities.

15             Number one, it could be his osteoarthritis

16   because he certainly had ostearthritis of the acromial

17   clavicular joint, which commonly would do it.

18             It could also be due to his rheumatoid

19   arthritis which can cause inflammation of the tendon

20   and make the tendon weak.

21             And then, three, it could have been due to

22

1    injury.  Because he did tell me about some -- an

2    altercation with a policeman and that he injured his

3    shoulder through that.

4            MRS. JOHNSON:  I don't have any further

5    questions.

6            EXAMINATION BY MR. STIEF:

7    Q       Doctor, I have a few questions for you.

8            Do you have your May 18th, 2007 note there?

9    A       Yes.  I should be able to find it.  Okay.

10   I have it.

11   Q       And May 18th, 2007 was the fist time you

12   ever saw Mr. Hutcherson, correct?

13   A       Yes, it is.

14   Q       And May 18th, 2007 was, approximately, four

15   months before the September 27th, 2007 incident in this

16   case?

17   A       Yes.

18   Q       And isn't it true that on May 18th, 2007

19   Mr. Hutcherson was complaining of left-shoulder pain?

20   A       Absolutely.

21   Q       And isn't it true that there are two

23

1   separate references to the left-shoulder pain in the

2   May 18th, 2007 report, one on page two near the bottom?

3   Is that correct?

4         A       You're talking about the physical

5   examination?

6         Q       Yes.

7         A       Yes.   In the physical exam, I do mention

8   that he does have decreased abduction of the left

9   shoulder causing pain.

10        Q       And what is abduction?

11        A       Abduction is when you move the shoulder in

12  this direction.

13        Q       And isn't it also true on page three of the

14  May 18th, 2007 report that there is a reference to

15  left-shoulder pain in your impressions?

16        A       Let me double-check here.

17        Q       The last sentence under one under

18  impressions, if that helps you.

19        A       Yes.

20        Q       And, Doctor, you were seeing Mr. Hutcherson

21  regularly between May 18th, 2007 through late

24

1    September, '07 and into the future, correct?

2          A       Correct.   Yes, sir.

3          Q       And you had planned to see him anyway?

4          A       Yes.

5          Q       And isn't it true that on October 5th,

6    2007, which was the first time he came to you after the

7    September 27th, 2007 incident, there is no specific

8    reference to left-shoulder pain?

9          A       There is on another sheet of paper but not

10   on my note.   Let me look.

11         Q       Would it help you if I showed you my copy?

12         A       Oh, I know that's my progress note.   But

13   there are two sheets of paper from the -- there is the

14   patient sign-in sheet and the one that I actually

15   dictate.

16                 Are you talking about October the 5th?

17         Q       Yes.

18         A       On his intake sheet, he did mark that he

19   was having shoulder pain.   But it's not something I

20   addressed at that visit because I was basically

21   injecting the knee at that visit.

1    Q    And you were treating him for all of his

2    extremities and his underlying arthritis condition?

3    A    Yes, sir.

4    Q    Both in October and from then on, every

5    time you've seen him it has been for his overall

6    rheumatoid and other arthritis conditions?

7    A    Correct.  Yes.

8         MR. STIEF:  I have no further questions.

9         EXAMINATION BY MRS. JOHNSON:

10   Q    I may have just one or two questions.

11        On May 18, 2007, as you testified, was

12   Mr. Hutcherson's first visit.

13        You state that he mentioned his

14   left-shoulder pain?

15   A    Yes, ma'am.

16   Q    Was that his chief complaint?  Or was that

17   one of his complaints?

18   A    One of his complaints.

19   Q    And did you take any x-rays of his left

20   shoulder?

21   A    Yes, I did.

26

1          Q      And did it reveal anything?

2          A      Yes.  It did show --

3                 MR. STIEF:  Objection.  Outside of the

4    scope of cross.

5                 You can answer.

6                 THE WITNESS:  It did show osteoarthritis of

7    the acromial clavicular joint.

8          Q      Did it show a partial tear?

9          A      You can't see a partial tear on a plain

10   film x-ray.

11                MRS. JOHNSON:  I have no further questions.

12                MR. STIEF:  That's it.

13                THE VIDEOGRAPHER:  The deposition has

14   concluded and we're off the record at 1713.

15                (Deposition concluded at 5:13 p.m.)

16

17

18

19

20

21

27

1    State of Maryland,

2    Prince George's County, to wit:

3            I, HEATHER AVALOS, a Notary Public

4    of the State of Maryland, do hereby certify that the

5    within-named witness, personally appeared before me

6    at the time and place herein set out, and after having

7    been duly sworn by me, according to law, was examined

8    by counsel.

9            I further certify that the examination was

10   recorded stenographically by me and this transcript

11   is a true record of the proceedings.

12           I further certify that I am not of counsel

13   to any of the parties, nor in any way interested in

14   the outcome of this action.

15           As witness my hand this 6th day of August,

16   2012.

17   _____

18                        HEATHER AVALOS,

19                        Notary Public

20   My Commission Expires:

21   December 21, 2015